UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Debra Franchi

        v.                              Civil No. 08-cv-395-JL
                                        Opinion No. 2009 DNH 139
New Hampton School

## O R D E R

This case presents several questions about the duties of a
private secondary school toward its students.  Defendant New
Hampton School ("NHS") moves to dismiss certain claims against it
by plaintiff Debra Franchi on the ground that they fail to state
a cause of action.  See Fed. R. Civ. P. 12(b)(6).  Franchi
alleges that NHS expelled her daughter because she suffered from
an eating disorder.  Following the submission of the parties'
memoranda, and a telephone conference with counsel, the court
ordered Franchi to file a supplemental memorandum showing that
her complaint stated a cause of action for certain additional
claims (which NHS had not moved to dismiss) in light of this
court's recent decision in Brodeur v. Claremont School District,
626 F. Supp. 2d 195 (D.N.H. 2009).

This court has subject-matter jurisdiction under 28 U.S.C.
§§ 1331 (federal question) and 1367 (supplemental jurisdiction).
After oral argument, the NHS's motion to dismiss is granted in
part and denied in part, and certain of Franchi's other claims

are also dismissed for failure to state a cause of action.  While Franchi has adequately alleged that CF suffered from a disability so as to bring her within the protection of various federal statutes, she has not alleged that CF suffered discrimination on the basis of her sex, nor has she stated claims for breach of fiduciary duty, intentional infliction of emotional distress, or violation of the New Hampshire Consumer Protection Act.


## I.   Applicable legal standard

To state a claim for relief, a complaint must set forth "[f]actual allegations [that are] enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and footnote omitted).  This showing "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id.  By the same token, the showing does not require "detailed factual allegations," id., simply "enough factual matter (taken as true) to suggest" the plaintiff's right to relief, id. at 556.

Furthermore, a court may act on its own initiative in questioning whether a complaint should be dismissed for failing to state a claim, provided that the plaintiff gets notice of the

potential dismissal and an opportunity to respond to it.  <u>See</u>,
<u>e.g.</u>, <u>Martinez-Rivera v. Sanchez Ramos</u>, 498 F.3d 3, 7 (1st Cir.
2007).  Franchi received those protections here, where the court
ordered her to file a memorandum explaining how certain counts of
her complaint stated a cause of action in light of <u>Brodeur</u>, and
she availed herself of that opportunity (as well as a
presentation at oral argument).

## II.  Background

The following allegations of Franchi's first amended
complaint are accepted as true for purposes of the motion to
dismiss.  <u>See</u>, <u>e.g.</u>, <u>Gray v. Evercore Restructuring L.L.C.</u>, 544
F.3d 320, 324 (1st Cir. 2008).  Franchi's daughter, CF, began her
freshman year at NHS, a private boarding school, in the fall of
2007, when she was 14 years old.  CF suffers from an eating
disorder, which she manages with the support of her family and
medical supervision.  Franchi alleges that the NHS director of
admissions, as well as an informational handout about counseling
services available at the school, "assured [Franchi] that CF's
eating disorder would not be a problem so long as CF was
responsible regarding her health."

During her Thanksgiving break from classes at NHS, CF began
a 10-day course of outpatient treatment for her eating disorder

from a clinic unaffiliated with the school.  Based on that clinic's recommendation, CF then attended a 10-day inpatient program at another clinic, followed by another 10-day outpatient program at the first clinic which concluded "around the Christmas and New Year holidays."  Franchi had discussed CF's treatment with the NHS director of counseling, who said that CF could take a medical leave of absence during the "couple weeks of school between the Thanksgiving break and the Christmas break."

CF's case manager at her outpatient clinic "recommended that she have an outpatient team in place to support her through her transition back to NHS."  In response, the school told Franchi, "We will do everything we can to support [CF] and the recommendations coming from" the clinic.  But Franchi was unable to "get the support in place" prior to CF's return to school in early January 2008; her appointments with her nutritionist and therapist would not take place until late that month.

About two weeks after CF's return to NHS, the school informed Franchi that CF's weight had dropped by 3¼ pounds.  Two days later, following the scheduled appointments with the nutritionist and therapist, NHS notified Franchi that CF's weight had fallen by another 1¼ pounds, to 114½ pounds.[1]  That same day,

---

[1]According to the outpatient clinic that evaluated CF in November 2007, her "ideal weight based on her height was between

4

two school officials called Franchi and "told her that NHS was discharging CF and instructed [Franchi] to immediately pick up her daughter," refusing to discuss the matter further.  NHS also "refused to consider an alternative program whereby CF could become a day student," discharging CF from both "the academic program and the boarding program."  And NHS also refused to refund "most of" the $49,000 in tuition and fees that Franchi paid for CF to attend NHS.

Franchi claims that NHS's decision was "at odds with [its] Student Life Handbook," which states that "the only situation that warrants immediate dismissal of a student is when 'a situation arises that potentially threatens personal safety or the safety of the community.'"  Franchi points out that various professionals who treated CF soon after her expulsion concluded that she in fact posed no danger to herself or others.

So Franchi commenced this action in this court.  Her amended complaint asserts eleven numbered counts against NHS:

- violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 (count 1);

_____

123 and 125 pounds."  According to the intake coordinator at another clinic where Franchi tried to place CF in January 2008, though, CF's weight loss that month placed her at only "93% of her ideal body weight and not in need of urgent care," which is not necessary until a patient reaches 85% of her ideal weight.

- violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (count 2);

- violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (count 3);

- violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 (count 4);

- breach of contract (count 7);

- breach of fiduciary duty (count 8);

- negligence in failing "to abide by the rules and policies set out in [NHS] literature and handouts" (count 9);

- negligence in failing "to implement and adhere to all federal and state regulations established for the operation of an educational facility receiving federal funding" (count 10);

- negligent infliction of emotional distress (count 11);

- intentional infliction of emotional distress (count 12);

- "respondeat superior/vicarious liability/agency" (count 13); and

- violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A (count 14).[2]

Franchi seeks, <u>inter alia</u>, damages on her own behalf for "mental and emotional harm, and further economic losses associated with [NHS's] refusal to refund payment of tuition," and on CF's behalf for "severe mental and emotional harm . . . as well as the damage

---

[2]Franchi has voluntarily dismissed counts 5 and 6.

with being forced to leave her friends and school and complete her high school education at a different institution."

### III. Analysis

NHS has moved to dismiss all of Franchi's federal law claims--those alleging violations of the ADA, the Rehabilitation Act, Title IX, and the FHA--as well as her state-law claims for breach of fiduciary duty and violation of the New Hampshire Consumer Protection Act, arguing that they fail to state a cause of action.  In addition, this court has ordered Franchi to show cause why certain of her state-law claims--those alleging breach of contract, negligent infliction of emotional distress by Franchi in her individual capacity, and intentional infliction of emotional distress--ought not to be dismissed for the same reason, and why her other negligence claims should not be stricken as duplicative of her breach of contract and federal statutory claims.[3]  As explained fully infra, counts 3, 8, 11

---

[3]While this court recognizes that "[a]s a general matter, sua sponte dismissals are strong medicine, and should be dispensed sparingly," Martinez-Rivera, 498 F.3d at 7 (internal quotation marks omitted), considering such a course of action was appropriate here to avoid repeating the situation that occurred in Brodeur.  There, the plaintiffs,  brought a similar twelve-count complaint against a school and other defendants, who did not move to dismiss, but, as trial neared, moved for summary judgment on all counts.  Though the motion was denied in part, dealing with the multitude of claims required a 77-page order

(insofar as it is alleged on behalf of Franchi individually) and 12 are dismissed, while the remaining claims will proceed through litigation in the normal course.

**A.   The federal claims**

NHS argues that Franchi has failed to allege that CF suffered from the "disability" or "handicap" necessary to bring her within the protections of the ADA, the Rehabilitation Act, and the FHA.  NHS further argues that the FHA does not apply because the school's dormitories are not "dwellings," and that Franchi has failed to state a claim under Title IX because she has not alleged that CF suffered discrimination "on the basis of sex."  The court will consider these arguments in turn.

**1.   "Disability"/"Handicap"**

Title III of the ADA, in relevant part, provides that "[n]o person shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services,

which the court was constrained to prepare in a short time, given the imminence of trial.  This timing also put the parties and their counsel on a shortened schedule for filing motions in limine and other final pretrial materials.  Considering the adequacy of at least some of the plaintiffs' twelve claims at the pleadings stage, as the court is doing here, would have ameliorated these consequences.

facilities, privileges, or accommodations of any place of public
accommodation by any person who owns, leases . . . or operates
[it]."  42 U.S.C. § 12182(a).  The Rehabilitation Act, also in
relevant part, provides that "[n]o otherwise qualified individual
with a disability in the United States . . . shall, solely by
reason of his disability, be excluded from participation in, be
denied the benefits of, or be subjected to discrimination under
any program or activity receiving Federal financial assistance."
29 U.S.C. § 794(a).  The FHA, again in relevant part, makes it
unlawful "[t]o discriminate in the sale or rental, or otherwise
to make unavailable or deny, a dwelling to any buyer or renter
because of a handicap of," among others, "that buyer or renter."
42 U.S.C. § 3604(f)(1).

All these statutes use the same definition of "disability"
or "handicap":  "(A) a physical or mental impairment that
substantially limits one or more major life activities . . . ;
(B) a record of such an impairment; or (C) being regarded as
having such an impairment."  42 U.S.C. § 12102(1) (formatting and
parenthetical omitted); id. § 3602(h) (defining "handicap" nearly
identically); 29 U.S.C. § 705(20)(B) (defining "individual with a
disability" under 29 U.S.C. § 794(a) as "any person who has a
disability as defined in" 42 U.S.C. § 12102).  NHS argues that
CF's eating disorder, as described in the complaint, does not fit

9

the statutory definition of "disability" because it does not
"substantially limit one or more major life activities."

As Franchi points out, the ADA was recently amended to,
among other things, specify that "major life activities include,
but are not limited to . . . eating."  ADA Amendments Act of 2008
("ADAAA"), Pub. L. 110-325, sec. 3(a), 122 Stat. 3553, 3554
(codified at 42 U.S.C. § 12102(2)(A) (2005 & supp. 2008)).[4]  But
NHS argues that, while eating is a "major life activity,"
Franchi has failed to allege that it was "substantially limited"
in CF's case by her eating disorder.  This argument depends on
too stringent a view of the "substantially limits" standard.

The Supreme Court had previously construed the phrase
"substantially limits one or more major life activities" in the
ADA to mean "prevents or severely restricts the individual from
doing [those] activities."  Toyota Motor Mfg., Ky., Inc. v.

---

[4]The ADAAA made the same change to the definition of
"disability" in the Rehabilitation Act.  Pub. L. 110-325, sec.
7(2), 122 Stat. at 3558 (codified at 29 U.S.C. § 705(20)(B)).
While the effective date of the ADAAA was not until January 1,
2009, id., sec. 8, 122 Stat. at 3559, after the events at issue
in this case, NHS does not question that the ADAAA's definition
of "major life activities" or, for that matter, any of its other
provisions, applies here.  Nor does NHS question that the ADAAA's
new definition of "disability" also applies to the FHA.  So the
court need not, and does not, decide whether the ADAAA applies
retroactively to events that occurred prior to their enactment,
but notes that, as the citations to pre-ADAAA caselaw infra
suggest, Franchi's claim would survive dismissal even under that
more rigorous standard.

<u>Williams</u>, 534 U.S. 184, 198 (2002).  But Congress later found that the case had "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended," Pub. L. 110-325, sec. 2(a)(7), 122 Stat. at 3553, and passed the ADAAA in part to reject that reading, <u>id.</u> § 2(b)(4), 122 Stat. at 3554.

To this end, the ADAAA inserted "Rules of construction" that the term "disability in [the ADA] shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]" and "'substantially limits' shall be interpreted consistently with the findings and purposes of the" ADAAA.  <u>Id.</u> sec. 4(a), 122 Stat. at 3555 (<u>codified at</u> 42 U.S.C. §§ 12102(4)(A), (B)).  These enumerated purposes include "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and . . . that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  <u>Id.</u> sec. 2(b)(5), 122 Stat. at 3554.

NHS's argument that Franchi has not adequately pled that CF's eating disorder "substantially limited" her eating so as to constitute a disability under the ADA is inconsistent with this Congressional mandate.  The amended complaint states that, after spending six straight weeks in outpatient and inpatient eating

11

disorder clinics from late November 2007 to early January 2008,
CF nevertheless lost nearly five pounds in the subsequent 16-day
period, dropping her weight to 93 percent of its ideal total.
These allegations state a claim that CF's eating disorder
substantially limited her eating, particularly under the "broad"
construction dictated by the ADAAA.  See, e.g., Rohr v. Salt
River Project Agric. Imp. & Power Dist., 555 F.3d 850, 859-62
(9th Cir. 2009) (applying pre-ADAAA standards but treating "the
original congressional intent as expressed in the [ADAAA]" as
relevant to the analysis in reversing summary judgment against a
plaintiff claiming diabetes substantially limited his eating).

     In Rohr, in fact, the court rejected an argument similar to
NHS's here:  that, because the amended complaint alleges that CF
"manages her disability" and was doing so at the time NHS
discharged her, the eating disorder could not have been
"substantially limiting" as a matter of law.  Rejecting the view
that the plaintiff's diabetes was not a disability because it
required only that "he stays on his medicines and watches what
and when he eats," Rohr observed that the plaintiff "alleged
substantial limitations on his eating in spite of his medicine
and insulin," including the need to monitor all aspects of his
food intake closely.  Id. at 860.  That could amount to a
substantial limitation, the court explained, because "[s]traying

from a diet for more than one or two meals is not a cause for medical concern for most people, and skipping a meal, or eating a large one, does not expose them" to health risks.  Id.

The same is true of CF's alleged condition, which required a careful watch over her food intake to protect against potentially dangerous weight loss.  See also Lawson v. CSX Transp., Inc., 245 F.3d 916, 927 (7th Cir. 2001) (rejecting the view, pre-ADAAA, that a plaintiff "could be substantially limited in his ability to eat only if his actual physical ability to ingest food is restricted," because it "failed to consider the extent of the restrictions imposed by [his] treatment regimen and the consequences of noncompliance"); McCusker v. Lakeview Neurorehab. Ctr., Inc., 2003 DNH 158, 10 (rejecting the argument that the plaintiff's diabetes was not a disability because it "does not limit his ability to eat, it mandates that he do so" as "misapprehend[ing] the meaning of substantially limits under the ADA") (internal quotation marks and ellipse omitted).  Even under the pre-ADAAA definition of "substantially limits," then, Franchi has adequately pled that CF's eating disorder substantially limited her eating, a major life activity.

While the amended complaint could have spelled out the limiting effect more clearly, the court of appeals has instructed--in another case decided prior to the ADAAA--that a

13

successful ADA claim does not require "excruciating details as to how the plaintiff's capabilities have been affected by the impairment," even at the summary judgment stage.  <u>Gillen v. Fallon Ambulance Serv., Inc.</u>, 283 F.3d 11, 24 (1st Cir. 2002). As the court noted, such a rule would create a "catch-22: in order to demonstrate that she is disabled, the plaintiff also would have to demonstrate why she is unqualified," thus dooming her claim under Title I of the ADA, which prevents discrimination against a qualified individual with a disability in the employment context.  <u>Id.</u>  While, under Title III, Franchi need not prove that CF was "qualified," the same reasoning applies: she does not have to allege that CF's eating disorder made her a danger to herself or others, justifying her expulsion from NHS, in order to reach the threshold of disability under the ADA.

CF's success in controlling her eating disorder, as alleged in the amended complaint, may well be relevant to the ultimate question of whether it substantially limited her eating--but that ultimate question is not yet ready for an answer.  Indeed, as NHS candidly acknowledges, all of the cases it cites in support of its argument for dismissal of Franchi's ADA claim "engaged in a factual inquiry as to whether the evidence before the court supported the claim that the conditions alleged 'substantially limited major life activities.'"  That kind of inquiry cannot be

14

conducted on the basis of the amended complaint alone which, as
just explained, alleges "enough factual matter (taken as true) to
suggest" the plaintiff's right to relief under the ADA.  Bell
Atl., 550 U.S. at 556.  NHS's motion to dismiss Franchi's claims
under the ADA, Rehabilitation Act, and FHA because she has failed
to allege that CF has a "disability" or "handicap" is denied.
See, e.g., McCusker, 2003 DNH 158, 8-10 (denying motion to
dismiss ADA claim as insufficiently alleging a disability).


**2.   "Dwelling"**

     NHS also argues that Franchi has no valid FHA claim because
the school's dormitories are not a "dwelling" subject to the
statute.  The FHA defines "dwelling" as "any building, structure,
or portion thereof which is occupied as, or designed or intended
for occupancy as, a residence by one or more families."  42
U.S.C. § 3602(b).  At first blush, this definition would appear
to exclude school dormitories, which ordinarily do not house
"families," but the FHA instructs that "'[f]amily' includes a
single individual.'"  42 U.S.C. § 3602(c).  Because a boarding
school dormitory is occupied as a residence by one or more
individuals, then, it fits the statutory definition of dwelling.

     In line with this analysis, a handful of courts have ruled
that a school dormitory is in fact a "dwelling" subject to the

FHA.  See United States v. Mass. Indus. Fin. Agency, 910 F. Supp.
2d 21, 26 n.2 (D. Mass. 1996) (granting summary judgment for
plaintiffs on the issue of whether a residential school
"satisfies the definition of 'dwelling'" in the FHA, but noting
the defendant did not dispute it); United States v. Hughes Mem'l
Home, 396 F. Supp. 544, 548-49 (W.D. Va. 1975) (ruling that
residences at children's home that provided schooling were
"dwellings"); see also Robert G. Schwemm, Housing Discrimination
Law and Litigation § 9:2 (2007).  NHS has not provided any
authority to the contrary.

     Instead, NHS argues that a regulation promulgated by the
Department of Housing and Urban Development contains an
"elaboration" on the statutory definition of "family" that
"clearly excludes a secondary school."  The regulation, however,
actually defines "familial status" as "one or more individuals
(who have not attained the age of 18 years) being domiciled with"
either a "[a] parent or other person having legal custody" or
that person's designee.  24 C.F.R. § 100.20 (2009) (formatting
omitted).  "Familial status," of course, is another prohibited
basis of discrimination under the FHA, 42 U.S.C. § 3604(b), so
there is no reason to believe HUD's definition of that term also
serves as a definition of "family" in the way NHS suggests.

Indeed, § 100.20 contains the same definition of "dwelling" as that contained in the FHA itself.[5]

NHS also argues that, because "one's ability to live in housing associated with an educational institution is necessarily dependent upon one's entitlement to attend [it]," calling dormitories "dwellings" under the FHA could interfere with an institution's educational mission by, for example, forcing a single-sex boarding school to open its doors to members of the opposite sex.  This is a valid point, but if the FHA can be read to exclude school dormitories from its scope, that reading cannot depend on its definition of "dwellings" in the way NHS urges. NHS has not challenged Franchi's FHA claim on any other basis, though, so its motion to dismiss that claim must be denied.

**3.    Title IX**

NHS is correct that Franchi has not stated a claim under Title IX, which provides that "[n]o person in the United States

---

[5]While the clear language of § 100.20 makes further inquiry unnecessary to determine its meaning, see Textron Inc. v. Comm'r, 336 F.3d 26, 31 (1st Cir. 2003) (citing, inter alia, Comm'r v. Soliman, 506 U.S. 168, 174 (1993), the court notes that in enacting the rule, HUD specifically rejected public comments "to provide comprehensive examples" of "dwellings," opting "to leave open the extent and scope of the term[]" instead.  Implementation of Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3238 (Jan. 23, 1989).  So the rule provides no support for NHS's position.

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," with a number of exceptions not relevant here.  20 U.S.C. § 1681(a).  Franchi does not allege that NHS excluded CF from participation in its programs "on the basis of sex," but on the basis of her eating disorder.  "Discrimination on the basis of sex is the sine qua non of a Title IX . . . case, and a failure to plead that element is fatal."  Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002).

Franchi argues that she has in fact alleged discrimination on the basis of CF's sex on the theory that "eating disorders disproportionately impact adolescent females."  While "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination," Cohen v. Brown Univ., 101 F.3d 155, 171 (1st Cir. 1996), Franchi alleges nothing of the sort.  "'"Disparate impact" claims involve . . . practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified'" on a neutral basis.  Prescott v. Higgins, 538 F.3d 32, 41 (1st Cir. 2008) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993)) (bracketing omitted).  Franchi alleges no

18

such practice, e.g., that NHS regularly discharges students with eating disorders, resulting in the dismissal of more boys than girls since girls are the ones who usually suffer from them.[6]

To the contrary, Franchi claims that NHS actually communicated a policy of attempting to assist students with eating disorders, but deviated from that policy in CF's case. "Where [a defendant] targets a single plaintiff . . . there is simply no basis for a disparate impact claim." Bramble v. Am. Postal Workers Union, 135 F.3d 21, 26 (1st Cir. 1998).  NHS's motion to dismiss Franchi's Title IX claim is granted.

**B.   The state-law claims**

**1.   Breach of fiduciary duty**

In moving to dismiss Franchi's claim for breach of fiduciary duty, NHS argues that no fiduciary relationship existed between it and CF as a matter of law.  Franchi's argument to the contrary is based on the New Hampshire Supreme Court's decision in Schneider v. Plymouth State College, 144 N.H. 458, 462 (1999), that "[i]n the context of sexual harassment by faculty members,

---

[6]At oral argument, Franchi requested leave to amend her complaint to allege such a practice, but is unclear what the good-faith basis of that allegation would be, at least at this stage.  Should discovery turn up evidence of such a practice, of course, Franchi may seek leave to amend at that point, and the court will decide that motion according to the usual standards.

the relationship between a post-secondary institution and its students is a fiduciary one."  This case, however, involves neither a post-secondary institution nor sexual harassment by faculty members.  This court predicts that the New Hampshire Supreme Court would not expand the obligations imposed by Schneider beyond its context and into the circumstances here.

Predicting the New Hampshire Supreme Court's course on an undecided issue of law requires "an informed prophecy of what [it] would do in the same situation, seeking guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law."  Walton v. Nalco Chem. Co., 272 F.3d 13, 20 (1st Cir. 2001) (internal quotation marks omitted).  It also demands "considerable caution" and respect for the "well-marked boundaries" of New Hampshire law.  Doyle v. Hasbro, Inc., 103 F.3d 186, 192 (1st Cir. 1996) (internal quotation marks omitted).  In particular, where a plaintiff, like Franchi, chooses a federal forum to litigate state-law claims, she "cannot realistically expect the federal court to open new state-law frontiers."  DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 916 (1st Cir. 1992).

In Schneider, a jury awarded a plaintiff $150,000 in compensatory and enhanced damages on claims for violation of

Title IX and breach of fiduciary duty against her former college. 144 N.H. at 461.  The jury found that the college failed to investigate the plaintiff's complaints that her male professor and academic advisor had engaged in "a pattern of sexual harassment and intimidation" toward her.  <u>Id.</u> at 461.  This included "taking off her shirt, and placing her hand on his genitalia" and, after the plaintiff rebuffed these advances, yelling at her, threatening her, ridiculing her in front of other faculty, and giving her an unfairly low grade.  <u>Id.</u>

In affirming the verdict on the fiduciary duty claim,[7] the New Hampshire Supreme Court noted that a fiduciary relationship "'may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.'"  144 N.H. at 462 (quoting <u>Lash v. Cheshire County Sav. Bank</u>, 124 N.H. 435, 462 (1984) (quotation marks and

---

[7]The plaintiff conceded error in the Superior Court's jury instructions on the Title IX claim, but argued that remand, rather than judgment in the college's favor, was the appropriate remedy.  144 N.H. at 458.  While the Supreme Court did remand the Title IX claim, it did not otherwise address it because the jury had returned a general verdict, which the Supreme Court affirmed on the basis of the fiduciary duty claim.  Thus, had the Supreme Court ruled that no fiduciary relationship existed, it would have needed to vacate the verdict and remand for another trial, despite the egregious nature of the conduct at issue.

formatting omitted by the court)).  In light of this standard, the court held that "[i]n the context of sexual harassment by faculty members, the relationship between a post-secondary institution and its students is a fiduciary one," since "[s]tudents are in a vulnerable situation because the power differential between faculty and students makes it difficult for students to refuse unwelcome advances and also provides the basis for negative sanctions against those who refuse."  Id. (quotation marks, bracketing, and ellipse omitted).

The court also made clear, however, that its "conclusion that a fiduciary relationship existed between the defendant[] and the plaintiff does not rest on the in loco parentis doctrine." Id. at 463.  Under that doctrine, the court explained, "a special relationship exists between primary and secondary schools and their students" which "imposes a duty of care upon schools to protect students."  Id. (citing Marquay v. Eno, 139 N.H. 708, 717-18 (1995)) (emphases added).  While that relationship is based "in part on the role of schools as parental proxies over minor students," the court continued, "[i]n contrast, the fiduciary relationship in this case rests on the unique relationship described above," i.e., the "professional relationship of trust and deference, rarely seen outside the academic community," between a university and its students.  Id.

As this court observed in Brodeur, the New Hampshire Supreme
Court in Schneider thus drew a distinction between the fiduciary
duty that a post-secondary school owes its students to protect
them from sexual harassment by faculty, and the duty of care that
a primary or secondary school owes its students.  626 F. Supp. 2d
at 219 n.24.  While those schools stand in loco parentis--a
"special relationship with students entrusted to their care,
which imposes upon them certain duties of reasonable
supervision," Marquay, 139 N.H. at 717--colleges and universities
generally do not, because "[t]he in loco parentis doctrine has
little application to the relationship between colleges and
universities and their students."  3 James A. Rapp, Education Law
§ 8.01[2][b][iii], at 8-9 (2008) (citing cases).  Indeed, the New
Hampshire Supreme Court has clarified that Marquay did not
"identif[y] a fiduciary duty" between a secondary school and its
students, but a common-law duty of care.  Berry v. Watchtower
Bible & Tract Soc'y of N.Y., Inc., 152 N.H. 407, 415 (2005).  As
a matter of law, then, the nature of the duty owed from NHS--a
secondary school--to CF was a duty of care arising out of its in
loco parentis status as in Marquay, rather than a fiduciary duty
arising from any "unique relationship" as in Schneider.

Rather than tying the claimed duty to a "unique
relationship," Franchi argues that a fiduciary duty arises any

time "a plaintiff puts a special trust or reliance upon an institution," as she claims to have done on CF's behalf in enrolling her at NHS despite her eating disorder.  While this court acknowledges that Schneider linked the existence of a fiduciary duty to the plaintiff's "special confidence" in the defendant, 144 N.H. at 462, the balance of the opinion makes clear that "special" does not mean simply "unusual," but "unique" or at least "rarely seen," id. at 463.  Otherwise, any number of relationships characterized by a duty of care, demanding simply "what reasonable prudence would require under similar circumstances," Carignan v. N.H. Int'l Speedway, Inc., 151 N.H. 409, 414 (2004) (internal quotation marks omitted), would become fiduciary, triggering an elevated duty to "behave in a selfless fashion," Lash, 124 N.H. at 438 (internal quotation marks omitted), as long as the party owed the duty could claim some "special trust."[8]  Schneider did not hearken such a fundamental change in the law, though it may have been groundbreaking in

---

[8]The most obvious example may be the doctor-patient relationship, where the patient no doubt places "special trust or reliance" in the doctor, but the duty to use reasonable care under the circumstances--rather than a fiduciary duty--governs. See, e.g., Smith v. Cote, 128 N.H. 231, 240 (1986).

imposing a fiduciary duty on a college to protect students from sexual harassment.[9]

Indeed, Franchi has not pointed to any authority extending the fiduciary duty recognized in Schneider beyond the "unique relationship" identified in that case, and this court is not aware of any.  To the contrary, courts, including this one, have declined to do so.  See Evans v. Taco Bell Corp., 2005 DNH 132, 33-35 (distinguishing Schneider in ruling that "the relationship between a fast food restaurant and its patrons is not of [fiduciary] character, even if the patrons have come to depend on the restaurant for quality meals"); Leary v. Wesleyan Univ., No. 55003943, 2009 WL 865769, at *12 (Conn. Super. Ct. Mar. 10, 2009) (distinguishing Schneider in rejecting fiduciary duty claim against a university arising out of a student's suicide; holding

---

[9]Most courts have treated the relationship between a college or a university and one of its students as essentially contractual in nature.  "That the relationship between a university and its students has a strong, albeit flexible, contractual flavor is an idea pretty well-accepted in modern case law."  Dinu v. Pres. & Fellows of Harvard Coll., 56 F. Supp. 2d 129, 130 (D. Mass. 1999); see also, e.g., Lyons v. Salve Regina College, 565 F.2d 200, 202 (1st Cir. 1977) (applying Rhode Island law) (quoting Slaughter v. Brigham Young Univ., 514 F.2d 622, 626 (10th Cir. 1975)); 3 Rapp, supra, § 8.01[2][d][I], at 8-16 & n.80 (citing cases from a number of jurisdictions).  Despite its apparent departure from this paradigm in Schneider, the New Hampshire Supreme Court discussed none of this authority, including one of its own prior cases holding that the relationship between a university and its students "is primarily governed by contract principles."  Gamble v. Univ. Sys. of N.H., 136 N.H. 9, 12-13 (1992).

that "a dependent relationship" does not suffice to establish a
fiduciary duty); Gonzalez v. Univ. Sys. of N.H., No. 451217, 2005
WL 530806, at *20 (Conn. Super. Ct. Jan. 28, 2005) (applying New
Hampshire law to reject a fiduciary duty claim arising out of a
college's alleged failure to supervise its cheerleading club,
calling it "a far cry from Schneider" in the absence "of a misuse
of a power differential . . . or abuse of a professional
relationship of trust and deference"); see also 3 Rapp, supra,
§ 8.01[2][d][g], at 8-27--28 (noting that "fiduciary theory has
not been widely embraced" in defining the student-institution
relationship, except for in Schneider and "the special
relationship that exists between an educational institution . . .
and graduate students engaged in original research," to protect
the student from plagiarism) (footnote omitted).[10]

_____

[10]This court's own research uncovered one case denying
summary judgment against a student on her claim for breach of
fiduciary duty arising out of her college's failure to
accommodate her disabilities during a study abroad program,
reasoning that the student had "reposed growing trust and
confidence" in the college as it promptly resolved previous
"accessibility problems that she encountered on the campus."
Bird v. Lewis & Clark Coll., 104 F. Supp. 2d 1271, 1278 (D. Or.
2000).  And court of appeals for the Ninth Circuit later affirmed
a jury's finding that the college owed the plaintiff a fiduciary
duty based on those facts, in addition to the college's
assurances that it would accommodate her disability.  303 F.3d
1015, 1023 (9th Cir. 2002).  Putting aside the fact that Franchi
does not rely on Bird, the court declines to follow it because
(1) it relies on too loose a notion of the "special confidence"
needed to create a fiduciary relationship and (2) in any event,
it arose in a post-secondary setting.

In line with these authorities, this court rules that, even if the allegations of Franchi's amended complaint suggest that she placed "a special trust or reliance" in NHS on CF's behalf, that was insufficient to give rise to a fiduciary duty.  Though NHS, like any other secondary school, owes its students a duty to use reasonable care to protect them, this court predicts that the New Hampshire Supreme Court would not extend its holding in Schneider to elevate that duty to a fiduciary one under the circumstances alleged here.  NHS's motion to dismiss Franchi's claim for breach of fiduciary duty is granted.

**2.   Violation of the Consumer Protection Act**

NHS also moves to dismiss Franchi's claim against it under the New Hampshire Consumer Protection Act.  The Act provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  N.H. Rev. Stat. Ann. § 358-A:2.  NHS argues that, first, the relationship between a school and its students does not fit within the "trade or commerce" governed by the Act and, second, the amended complaint fails to allege anything approaching the "unfair or deceptive act[s] or practice[s]" prohibited by the Act.

NHS's first argument is based on <u>Brzica v. Trustees of
Dartmouth College</u>, 147 N.H. 443 (2002).  There, the New Hampshire
Supreme Court ruled that "the 'trade or commerce' requirement of
the statute [was] not met" in a case claiming that a college had
fraudulently solicited donations from alumni without disclosing
that its trustees had decided to eliminate single-sex
fraternities and sororities from campus, because the donations
"were not business transactions and contributors of such gifts
are not consumers seeking to purchase goods or services."  <u>Id.</u> at
451-52.  But NHS does not explain how Franchi, who was not making
a gift to the school but paying tuition in exchange for CF's
education there, equates with the alumni donors in <u>Brzica</u>, and
that proposition is not apparent to the court.  In any event, the
court need not decide whether NHS is correct that Franchi has not
alleged "trade or commerce," because the court agrees that she
has not alleged the "unfair or deceptive act or practice" which
is also essential to her consumer protection claim.

While the Consumer Protection Act lists several categories
of unfair or deceptive acts or practices, N.H. Rev. Stat. Ann.
§ 358-A:2, I-XIV, Franchi does not attempt to fit NHS's alleged
actions into any of those categories, which would not appear to
accommodate NHS's alleged behavior.  That is not the end of the
matter, though, because the Act outlaws conduct "includ[ing], but

not limited to" that listed in the categories; thus, other
conduct may amount to unfair or deceptive acts or practices,
provided it is "of the same type as proscribed by the enumerated
categories." New Hampshire v. Moran, 151 N.H. 450, 452 (2004).
But, in addition, "'[t]he objectionable conduct must attain a
level of rascality that would raise an eyebrow of someone inured
to the rough and tumble of the world of commerce.'" Barrows v.
Boles, 141 N.H. 382, 390 (1996) (quoting Levings v. Forbes &
Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979)
(construing Massachusetts Consumer Protection Act).

NHS's alleged conduct--which the amended complaint specifies
as "making misrepresentations as to [the school's] ability and
willingness to educate [CF]"--does not meet this standard.  The
only statements by NHS about its "ability and willingness to
educate [CF]" which the amended complaint identifies are
generalized assurances, e.g., "CF's eating disorder would not be
a problem as long as CF was responsible regarding her health";
that NHS counselors "are here . . . to listen, understand, and
offer support to you as you work towards confronting and
resolving your problems," including eating disorders; and that
"[w]e will do everything we can to support [CF] and the
recommendations coming from" her outpatient clinic.  As this
court has previously noted, these kinds of vague statements

29

cannot support a consumer protection claim.  <u>See</u>  <u>Private Jet
Servs. Group, Inc. v. Sky King, Inc.</u>, 2006 DNH 116, 13-14; <u>Evans</u>,
2005 DNH 132, 32-33 & n.19.

    And, assuming that they could, and assuming that NHS
dishonored them by discharging CF as alleged, broken promises
alone do not rise to the level of rascality where successful
Consumer Protection Act claims dwell.[11]  "An ordinary breach of
contract claim does not present an occasion for the remedies
under the Consumer Protection Act."  <u>Barrows</u>, 141 N.H. at 390;
<u>see also</u> <u>McNeal v. Lebel</u>, 157 N.H. 458, 469 (2008) (affirming
ruling that home builders did not violate RSA 358-A by breaking
their promise "to deliver and complete a reasonably defect-free
house in six weeks when they knew they couldn't, or were at least
indifferent as to whether they could") (internal quotation marks
omitted).[12]  NHS's motion to dismiss Franchi's Consumer
Protection Act claim is granted.

---

    [11]The same reasoning applies to NHS's alleged misstatements
about its "ability and willingness to comply with state and
federal law"--leaving aside that the amended complaint fails to
identify any statements to that effect.

    [12]The only case on which Franchi relies is <u>Snow v. American
Morgan Horse Ass'n</u>, 141 N.H. 467 (1996), where the court ruled
that fraudulently registering foals as the offspring of a
particular mare was not "trade or commerce" that "implicated the
Consumer Protection Act."  <u>Id.</u> at 471.  That case is not helpful
to her.

### 3.   Infliction of emotional distress

As discussed <u>supra</u>, this court ordered Franchi to show, with reference to its <u>Brodeur</u> decision "and any other relevant authority, how her first amended complaint states a claim for . . . negligent infliction of emotional distress by Deborah Franchi in her individual capacity, and intentional infliction of emotional distress" (numbering omitted).  Franchi submitted a memorandum in response to that order, but it fails to show that the amended complaint states either of those causes of action.

First, as this court noted in <u>Brodeur</u>, a parent can recover in negligence for the emotional distress of injury to her child under New Hampshire law only if that distress is "'directly attributable to the emotional impact of [the parent's] observation or contemporaneous sensory perception' of the defendant's conduct."  626 F. Supp. 2d at 226 (quoting <u>Corso v. Merrill</u>, 119 N.H. 647, 656 (1979)).  The amended complaint does not allege that Franchi experienced a "contemporaneous sensory perception" of NHS's discharging CF.  While Franchi's supplemental memorandum relates that "she saw her distraught daughter" upon arriving on campus to pick her up <u>after</u> her discharge, that does not suffice (even if treated as a further amendment to the complaint).  Under the rule allowing a parent to recover for emotional distress, "recovery will be denied if the

31

[parent] either sees the accident victim at a later time, or if the [parent] is later told of the seriousness of the accident." Corso, 119 N.H. at 657.  In a further shortcoming, Franchi also does not allege that she suffered "a painful mental experience with lasting effects" that "manifest[ed] itself by way of physical symptoms."  Id. at 653.  She has failed to state a claim on her own behalf--as opposed to on behalf of CF--for negligent infliction of emotional distress.

Second, the amended complaint fails to state a claim for intentional infliction of emotional distress on behalf of either Franchi or CF.  As an initial matter, the amended complaint seeks recovery under this theory on behalf of "the minor Plaintiff" only, not Franchi.  Her supplemental memorandum nevertheless argues a claim for intentional infliction of distress on her own part, but, even treating that as a further amendment to the complaint, the claim cannot succeed.  Nor, for that matter, can such a claim on behalf of CF.

Liability for intentional infliction of emotional distress follows only from "'extreme or outrageous conduct,'" which the New Hampshire Supreme Court has defined as conduct "'"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."'"

32

Brodeur, 626 F. Supp. 2d at 224 (quoting Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 728-29 (2009) (quoting Restatement (Second) of Torts § 46 cmt. *d*, at 73 (1965))).  NHS's conduct toward CF comes nowhere near this "formidable standard."  Id.

Indeed, in Mikell, the New Hampshire Supreme Court upheld the dismissal of an intentional infliction of emotional distress claim against a teacher who "misused her position of authority over [a student] by making a false report of misconduct in an effort to affect his disciplinary record and eventually expel him," ruling that "the alleged false accusation here, even coupled with [the teacher's] position of authority, rises to the level of extreme and outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress."  158 N.H. at 729.  That case is controlling here, where Franchi alleges, similarly, that NHS wrongfully discharged CF, either in violation of its own statements and policies or upon the mistaken belief that she was a danger to herself or others--and does not even allege a "false accusation" as in Mikell.  Franchi has not stated a claim for intentional infliction of emotional distress either on behalf of herself or CF.[13]

_____

[13]It should be noted that, at oral argument, Franchi conceded that, but for the breach of contract claim, "all other counts belong to the minor," CF.

**4.    The other state-law claims**

While the court also ordered Franchi to explain how her amended complaint stated a contract cause of action, NHS has candidly acknowledged that, unlike Brodeur, the contract claim arises out of more than simply the student handbook; indeed, at oral argument, NHS made reference to an actual contract between it and Franchi, and stated that this was "clearly" a breach of contract case (though not conceding, of course, that any contract was in fact breached).  So that claim will not be dismissed.  The court also ordered Franchi to show why her negligence claims, which allege violations of NHS's duties under the ADA, the Rehabilitation Act, and the parties' contract, are not duplicative of her statutory and contract claims; while the court remains concerned that the claims completely overlap, it will not strike the negligence counts at this point, leaving consolidation of Franchi's theories till the summary judgment or final pretrial stage, if necessary.

**III. Conclusion**

This court has observed that "scattershot pleading is disfavored and counterproductive."  Marier v. Town of Allenstown, 2003 DNH 172, 30; see also, e.g., Mueller Co. v. U.S. Pipe & Foundry Co., 2003 DNH 168, 17; DRN, Inc. v. Suffolk County

34

Constr. Co., 2001 DNH 001, 12 (citing additional cases).  That is, while creativity in "identifying all possible torts and tortfeasors" out of a particular fact pattern may impress a professor grading a law school exam, it will rarely impress this court, given the extra work that approach generates for court and counsel, particularly in forcing the consideration of difficult legal questions that need not be surmounted in order for the plaintiff to recover on some other, more clearly established, theory.  In light of these concerns, counsel for Franchi are urged to consider winnowing down their theories even further as the litigation progresses.  For now, though, NHS's motion to dismiss[14] is GRANTED as to counts 3, 8, and 14 and otherwise DENIED; counts 11 (insofar as it is alleged on behalf of Franchi individually) and 12 are also DISMISSED.


        **SO ORDERED.**

                                    _____
                                    Joseph N. Laplante
                                    United States District Judge

Dated:  September 18, 2009

cc:  Donna-Marie Cote, Esq.
     Peter E. Hutchins, Esq.
     Andrew W. Serell, Esq.

_____

        [14]Document no. 7.

35