UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| |
|---|
| **Debra Franchi, Individually and as Parent and Guardian of CF**   **Plaintiffs** |
| v. |
| **New Hampton School**   **Defendant** |

Civil Action No. 1:08-cv-395-JL

## SECOND AMENDED COMPLAINT

### THE PARTIES

1. The Plaintiff, Debra Franchi, is a citizen of the State of New Hampshire. She resides in Wonalancet, New Hampshire. She is the mother and guardian of her daughter, CF, the minor Plaintiff.

2. The Defendant, New Hampton School, is a private, boarding school. It is registered with the New Hampshire Secretary of State as a nonprofit corporation. It maintains a place of business at 34 Doctor Childs Road, New Hampton, New Hampshire 03256.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

4. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiffs and Defendants are located in the District of New Hampshire.

**FACTS**

6. CF is a young, teenage girl. She was born in 1993, and was 14 at the time of the events set forth in this Complaint.

7. As is the case with so many adolescent girls in this country, CF suffers from an eating disorder. With the support of her family and medical supervision, she manages her disability.

8. CF's mother, wanting the best education for her daughter, looked into enrolling CF at New Hampton School ("NHS"), a private boarding school. Cognizant of her daughter's disability, CF's mother met with NHS's Director of Admissions and informed her of CF's eating disorder. The Director assured CF's mother that CF's eating disorder would not be a problem so long as CF was responsible regarding her health. To make certain that NHS had full knowledge of CF's condition, CF's mother gave NHS's Director of Counseling permission to speak with CF's therapist.

9. CF's mother was reassured that NHS could adequately educate and provide for her daughter, not only based upon the assurances given by NHS staff, but also by literature NHS provided to her. An informational handout from NHS titled, "Counseling services available" specifically identifies eating disorders as one of the problems that NHS is able to address. It states:

> "The counselors at New Hampton School are trained and experienced helpers. We know at times life can be difficult, if not overwhelming. It is in those hard times you may need support. That's why we are here . . . to listen, understand, and offer support to you as you work towards confronting and resolving your problems."

This same counseling handout, in speaking about medical/emotional issues, also makes clear that a leave of absence, not discharge, may be appropriate for "behaviors putting the student or community at risk."

10.     CF started her freshman year at NHS in the fall of 2007. She had never attended a boarding school, nor had she experienced long separations from her family. As one would expect, CF was anxious at first as she assimilated into this new environment. Because she suffered from an eating disorder, her anxiety made it more difficult for her to manage her weight, but with the continued support and encouragement of her parents, CF slowly adjusted to boarding school life. In fact during the fall trimester, NHS recognized CF for "excellent academic performance," earning her a place on the High Honor Roll.

11.     Out of an abundance of caution, CF's mother, in an effort to identify any decrease in her daughter's weight long before it became a health risk, asked NHS to weigh her daughter each week and report the results to her. During the first trimester, NHS reported that CF's weight fluctuated between a baseline of 120 pounds and 124 pounds. As a deterrent to CF's weight loss, NHS would not allow CF to participate in dance classes.

12.     On Friday, November 16, 2007, CF's mother had CF evaluated by the Cambridge Eating Disorder Center ("CEDC") in Cambridge, MA. With the Thanksgiving break approaching, CF's mother believed that her daughter could benefit by using this time for intensive medical treatment at an outpatient program. NHS's Director of Counseling also thought that the two-week Thanksgiving break would be a good time for CF to start treatment because it would not interfere with CF's studies.

13.     NHS's Director of Counseling also told CF's mother that, if CF would benefit from longer treatment, she could take a medical leave of absence for a couple weeks. Since there

- 3 -

were only a couple weeks of school between the Thanksgiving break and the Christmas break, CF would miss minimal school and would not be responsible for the work missed because it was a medical leave.

14. CF started treatment at the CEDC over the Thanksgiving break. She attended CEDC's outpatient treatment for 10 days. The CEDC diagnosed her with an eating disorder, not specified. Thereafter, CF's mother and CF's Case Manager at the CEDC, discussed the fact that due to the school's calendar, CF could benefit from a more intensive inpatient treatment approach without missing significant time from school.

15. In accordance with the CEDC's recommendation, CF's mother enrolled her in Walden Behavioral Care's Eating Disorder Program. CF received 10 days of inpatient treatment at Walden.

16. Following CF's discharge from Walden, she returned to the CEDC's outpatient program for another 10 days. When CF completed treatment, her CEDC Case Manager recommended that she have an outpatient treatment team in place to support her through her transition back to NHS as well as her continued recovery. The Case Manager provided these **recommendations** to NHS in a letter dated December 28, 2007. In a letter dated January 16, 2008, to the Franchis, NHS set forth their acceptance of the CEDC's recommendations stating, "We understand the transition back will be challenging and something she [CF] needs to work on daily. We will do everything we can to support her and the recommendations coming from the CEDC."

17. The CEDC discharged CF around the Christmas and New Year holidays. CF's mother could not get the support in place that the CEDC recommended prior to CF returning to NHS because the practitioners were on vacation. CF returned to NHS on January 7, 2008,

- 4 -

although her first appointment with a Nutritionist would not be until January 22, 2008, and her Therapist until January 23, 2008.

18. NHS's Director of Counseling, upon CF's return to NHS, told CF's mother that if CF required additional treatment, that she would not be allowed to take another leave of absence. This contradicts NHS's Student Life Handbook, which places no limit on the number of medical leaves a student may take and does not restrict the length of a medical leave. NHS also told CF's mother that CF could not miss any classes to go to doctor appointments. This placed the additional burden on CF's mother of limiting her search for a primary care physician to the Concord area so that the facility would be commutable to NHS. As a result of NHS's constriction, CF's mother could not secure a primary care physician for CF prior to her return to NHS.

19. CF returned to NHS on Monday night, January 7, 2008, with classes scheduled to begin Tuesday morning. NHS's Director of Counseling told CF the day that she returned to NHS that she was responsible for the missed assignments during her medical leave of absence, despite the fact that NHS's Director of Counseling told CF's mother in November prior to CF's leave that CF would not be responsible for the material.

20. NHS's arbitrary decision to require CF to make-up these missed assignments caused CF to feel anxious and overwhelmed her first week back at NHS. CF's mother, in response to her daughters anxiousness, called CF's Case Manager at the CEDC. The CEDC Case Manager told CF's mother that her daughter had made positive mental changes in the two weeks since she had been out of their program: CF decided to take control of her life, committed to staying at NHS, and decided to be healthy. The Case Manager said that the fact that CF articulated these feelings was a very important positive step in CF's recovery. Out of an

abundance of caution, the Case Manager suggested putting CF's name on the waiting list for a residential treatment program at Klarmen's Eating Disorder Center at McLean Hospital ("Klarmen"). This was solely a precautionary measure in case the need arose.

21.     In accordance with the CEDC Case Manager's suggestion, CF's mother contacted Klarmen to put her daughter on the waiting list. The Klarmen Intake Coordinator, however, echoed what the CEDC Case Manger had told CF's mother. Klarmen's Intake Coordinator said that CF was making positive mental steps in her recovery and that she should be given the opportunity to make positive behavior changes to turn things around on her own. She did not feel that CF was a candidate for inpatient treatment at Klarmen. Nonetheless, at the insistence of CF's mother, she reluctantly put CF on the waiting list in case CF's condition deteriorated.

22.     NHS's Director of Counseling called CF's mother on January 21, 2008, to inform her that CF's weight had decreased over the last two weeks by 3.25 pounds. CF's mother told NHS's Director of Counseling that CF's first appointment with a nutritionist was on the 22nd and that her first appointment with a therapist was on the 23rd. She expressed her hope that NHS would give CF the opportunity to allow her outpatient support team to work with her since NHS had agreed to support the recommendation of the CEDC Case Manager. The CEDC Case Manager recommended that these medical providers be in place to support CF through the recovery process and help CF reach her ideal body weight. The Case Manager did not expect CF to do this alone while transitioning back to school.

23.     On January 24, 2008, NHS advised CF's mother that her daughter had lost 1.25 pounds and weighed 114.5 pounds. CF's mother contacted Klarmen to ascertain CF's position on the waiting list and to have them reassess CF's current situation to see whether she qualified for admission. Klarmen's Intake Coordinator stated that CF was at 93% of her ideal body weight

and not in need of urgent care. She said that an individual is considered medically anorexic and in need of care when she is below 85% of her ideal body weight. Although Klarmen's Intake Coordinator agreed to keep CF's name on the waiting list, she told CF's mother that if a bed became available, it would not be given to CF under her current circumstances because CF was demonstrating positive behavioral changes and slowly moving in the direction of recovery.

24. NHS's Dean of Students and NHS's Director of Counseling called CF's mother at 3:45 in the afternoon on January 24, 2008. NHS told her that NHS was discharging CF and instructed CF's mother to immediately pick up her daughter. NHS refused to discuss the matter with CF's mother and the fact that the therapists had told her that CF was on the road to recovery mentally and that CF's weight was only one piece of the puzzle.

25. NHS discharged CF from the academic program and the boarding program. NHS refused to consider an alternative arrangement whereby CF could become a day student. NHS's Dean of Students told CF's mother that a discussion would not do any good because the decision had been made.

26. NHS's discharge of CF is at odds with NHS's Student Life Handbook. According to the handbook, the only situation that warrants immediate dismissal of a student is when "a situation arises that potentially threatens personal safety or the safety of the community." At the time that NHS unilaterally and without notice discharged CF, none of CF's doctors, therapists or medical providers, believed that she was a danger to self or others. In fact, the CEDC Case Manager whom NHS agreed to support, stated that CF was not a danger to herself or in medical or psychiatric crisis when NHS discharged her on January 24, 2008. CF's nutrition therapist stated that CF did not present a danger to herself or others at the time NHS discharged her. CF's therapist at Portsmouth and Exeter Mental Health Associates, Inc. also stated that CF was not a

danger to self and that CF was open and committed to the therapeutic process. CF's primary medical provider at White Mountain Community Health Center stated that CF had been seen at regular intervals for blood work and weight checks and that lab values were all within normal range and that CF was not medically at risk for hospitalization in an inpatient facility.

27. NHS failed to obtain a single evaluation from a medical doctor or psychiatrist as to CF's mental state and whether she posed a danger to self or others. In fact, not only did no medical doctor or psychiatrist indicate that CF posed a danger to self or others, but most indicated the opposite, i.e., that CF was on the road to recovery.

28. CF is 5'7" tall. The CEDC estimated that CF's ideal weight based on her height was between 123 and 125 pounds. According to NHS, at the time that it discharged CF, she weighed 114.5 pounds. This places CF at 93% of her ideal weight. Klarmen advised that because CF is at 93% of her ideal weight, she is not medically at risk and that they would not enroll her in their program. Klarmen indicated that CF was on the path to recovery and only needed outpatient support.

29. From the time that CF returned to school on January 7, 2008, through the time that NHS discharged her on January 24, 2008, according to NHS, CF's ranged from 114.5 pounds to 119 pounds.

30. CF's mother paid approximately $ 49,000 so that her daughter could attend NHS. After NHS discharged CF, it refused to refund most of the tuition and fees paid.

31. CF suffered emotionally as a result of NHS actions. At the time that NHS discharged her, she was on the path to recovery, maturing, and developing strength. Her unexpected discharge caused her embarrassment and self-doubt. It became an obstacle to her recovery that she had to overcome. She was forced to adjust to a new school mid-year.

Beginning school mid-way through a year is far more stressful than beginning in the fall with one's peers. Studies are underway, peer relationships are formed, and the adolescent who arrives in the middle is simply a stranger without support. NHS stole CF's support structure and forced her into a situation of isolation.

## LEGAL THEORIES OF LIABILITY

### COUNT I

**(Violation of the Americans with Disabilities Act of 1990, 42 USC § 12101 *et seq.*)**

32. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

33. The Americans with Disabilities Act ("ADA") defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment." 42 USC §12102. The ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 USC §12182(a).

34. Defendant NHS receives federal education funding. NHS, although a private school, is considered a place of public accommodation. 42 USC § 12181(7)(J).

35. Defendant despite receiving full tuition payment, discharged the minor Plaintiff solely and exclusively because she suffered from an eating disorder. Defendant discriminated against the minor Plaintiff in violation of the ADA because it refused to allow the minor Plaintiff

to attend classes and refused to allow the minor Plaintiff to live on campus either because of the Plaintiff's disability or because the Defendant regarded the minor Plaintiff as suffering such an impairment.

36. As a result of Defendant's violation of the ADA, the Plaintiffs were damaged emotionally and financially. Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT II

### (Violation of The Rehabilitation Act of 1973, 29 USC § 701, *et seq.* )

37. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

38. Section 504 of the Rehabilitation Act states (in part): "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 USC § 794.

39. Defendant NHS receives federal education funding.

40. Defendant, despite receiving full tuition payment, discharged the minor Plaintiff solely and exclusively because she suffered from an eating disorder. Defendant discriminated against the minor Plaintiff in violation of the Rehabilitation Act because it refused to allow the minor Plaintiff to attend classes and refused to allow the minor Plaintiff to live on campus either

because of the Plaintiff's disability or because the Defendant regarded the minor Plaintiff as suffering such an impairment.

41. As a result of Defendant's violation of the Rehabilitation Act, the Plaintiffs were damaged emotionally and financially. Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT IV

### Violation of The Federal Fair Housing Act, 42 U.S.C. 3601

48. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

49. The Federal Fair Housing Act, 42 U.S.C. 3601 et seq., prohibits discrimination by direct providers of housing because of a disability.

50. Defendant, despite receiving full tuition payment, discharged the minor Plaintiff solely and exclusively because she suffered from an eating disorder. Defendant either because of the minor Plaintiff's disability or because it regarded the Plaintiff as suffering such an impairment refused to allow the minor Plaintiff to live on campus in violation of Federal law, which prohibits denying housing accommodations on either the basis of a disability or on the basis of being regarded as suffering such an impairment.

51. As a result of Defendant's violation of the Federal Fair Housing Act, the Plaintiffs were damaged emotionally and financially. Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

because of the Plaintiff's disability or because the Defendant regarded the minor Plaintiff as suffering such an impairment.

41. As a result of Defendant's violation of the Rehabilitation Act, the Plaintiffs were damaged emotionally and financially. Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT IV

### Violation of The Federal Fair Housing Act, 42 U.S.C. 3601

48. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

49. The Federal Fair Housing Act, 42 U.S.C. 3601 et seq., prohibits discrimination by direct providers of housing because of a disability.

50. Defendant, despite receiving full tuition payment, discharged the minor Plaintiff solely and exclusively because she suffered from an eating disorder. Defendant either because of the minor Plaintiff's disability or because it regarded the Plaintiff as suffering such an impairment refused to allow the minor Plaintiff to live on campus in violation of Federal law, which prohibits denying housing accommodations on either the basis of a disability or on the basis of being regarded as suffering such an impairment.

51. As a result of Defendant's violation of the Federal Fair Housing Act, the Plaintiffs were damaged emotionally and financially. Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT VII

### (Breach of Contract)

60. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

61. Plaintiff informed Defendant of the minor Plaintiff's eating disorder prior to the minor Plaintiff commencing her studies at NHS. NHS provided an informational handout to Plaintiffs titled, "Counseling services available" which indicates that NHS is able to address eating disorders.

62. Plaintiff paid the tuition and all fees associated with educating her daughter at NHS for the school year 2007-2008.

63. Defendant despite receiving full tuition payment, discharged the minor Plaintiff solely and exclusively because she suffered from an eating disorder.

64. Defendant breached its contract with the Plaintiff when it discharged the minor Plaintiff due to her eating disorder.

65. Defendant refused to refund all monies paid by the Plaintiff to educate her daughter at NHS.

66. As a result of Defendant 's breach of contract, the Plaintiffs were damaged emotionally and financially. Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT IX

### (Negligence)

73. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

74. Defendant had a duty to abide by the rules and policies set out in the Defendant's literature and handouts.

75. Defendant breached its duty to enforce the rules and policies contained in the material.

76. Defendant knew or should have known that its agents were not adhering to the Defendant's policies and rules by, among other things, allowing a hostile environment to exist in the educational setting that failed to accommodate disabled students.

77. As a direct and proximate result of Defendant's breach, the Plaintiffs suffered emotional and financial damages.

78. To the extent that Defendants' acts were intentional and done in bad faith, Plaintiffs are entitled to attorney's fees and costs. Due to Defendants' actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT X

### (Negligence)

79. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

80. Defendant had a duty to implement and adhere to all federal and state regulations established for the operation of an educational facility receiving federal funding.

81. Defendant breached these duties by, among other things, failing to keep and accommodate disabled students.

82. As a direct and proximate result of Defendant's breach, the Plaintiffs suffered emotional and financial damages.

83. To the extent that Defendant's acts were intentional and done in bad faith, Plaintiff is entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiff is entitled to enhanced compensatory damages.

## COUNT XI

### (Negligent Infliction of Emotional Distress)

84. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

85. Defendant had a duty to the minor Plaintiff to refrain from negligently engaging in conduct that it knew or should have known would cause emotional distress to the minor Plaintiff.

86. Defendant engaged in a negligent course of conduct that included, but is not limited to, negligently failing to accommodate the minor Plaintiff's disability, negligently monitoring the Plaintiff's health, negligently discharging the minor Plaintiff, negligently reporting her condition, etc.

87. Defendant's negligent acts unreasonably subjected the minor Plaintiff to a foreseeable risk of emotional harm.

88. As a direct and proximate result of Defendant's negligence, the Plaintiffs suffered emotional and financial damages. To the extent that Defendant's acts were intentional and done in bad faith, Plaintiffs are entitled to attorney's fees and costs.

89. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## COUNT XIII

### (Respondeat Superior/Vicarious Liability/Agency)

94. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

95. To the extent that any of the negligent acts alleged were carried out by employees, servants or agents of NHS, Plaintiffs claim that under the New Hampshire doctrine of *respondeat superior*, Defendant NHS is vicariously liable for any and all such negligent acts giving rise to legal fault under any of the theories alleged.

96. As a result of the actions of Defendant's agents and/or employees, Plaintiffs have been damaged. To the extent that Defendant's acts were intentional and done in bad faith, Plaintiffs are entitled to attorney's fees and costs. Due to Defendant's actions and the aggravating circumstances, Plaintiffs are entitled to enhanced compensatory damages.

## DAMAGES AND INJURIES

104. All factual allegations contained in the preceding paragraphs of this Declaration are repeated and incorporated by reference into the following Count wherever necessary and appropriate to set forth a cause of action herein.

105. Plaintiff CF Franchi, as a result of Defendant's actions and conduct, suffered severe mental and emotional harm, including but not limited to nightmares, physical sickness, fear, and other emotional harm, sustained loss of the enjoyment of life, sustained past, present and future physical and emotional pain, suffering and distress, suffered indignities and humiliation, and suffered other legally recognized compensatory damages. She also suffered a disruption in her education, as well as the damage associated with being forced to leave her friends and school and complete her high school education at a different institution.

106. Plaintiff Debra Franchi also suffered mental and emotional harm, and further suffered economic losses associated with the Defendant's refusal to refund payment of tuition.

107. In addition to said damages, Plaintiffs claim interest and costs, including taxable costs, as well as attorney's fees and costs – generally and as described in specific counts in this declaration.

108. Further, Defendant's conduct was wanton, malicious and oppressive and undertaken with ill will, hatred, hostile or evil intent and purpose.

109. As a result, the nature of Defendant's conduct as described above entitles Plaintiffs to enhanced compensatory damages for their injuries under New Hampshire law.

110. Accordingly, the Plaintiffs demand judgment against the Defendant in an amount within the minimum and maximum jurisdictional limits of this Court, together with costs, interest, and attorney's fees.

## **DEMAND FOR JURY TRIAL**

A. Plaintiffs request a trial by a jury;

B. Plaintiffs also request that this matter be placed on a one-year trial track;

    C.    Plaintiffs further request that this matter be scheduled for a Court-ordered mediation session at an appropriate time during the pendency of the case; and

    D.    For other such relief as may be just.

Date: January 7, 2010

Respectfully Submitted,
**Debra Franchi, Individually and as Parent and Guardian of CF Franchi**
By Their Attorneys
**Wiggin & Nourie, P.A.**

By:     /s/ Donna-Marie Cote
Peter E. Hutchins, Esq. (NH Bar ID #1231)
Donna Marie Cote, Esq. (NH Bar ID #14543)
670 No. Commercial St., Suite 305
P.O. Box 808
Manchester, NH 03105-0808
Phone: (603) 629-4566
Fax: (603) 623-8442

01108062.DOC

WIGGIN & NOURIE, P.A., MANCHESTER, NEW HAMPSHIRE